AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

| LODGED | | FILED |
|---|---|---|
| CLERK, U.S. DISTRICT COURT | | CLERK, U.S. DISTRICT COURT |
| **3/30/26** | | **March 30, 2026** |
| CENTRAL DISTRICT OF CALIFORNIA | | CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___ MRV ___ DEPUTY | | BY: ___ iV ___ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

Evelyn Tindimubona,

Defendant.

Case No.  2:26-mj-01798-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

[18 U.S.C. §§ 1347, 2]

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about November 4, 2022, in Los Angeles County and elsewhere, defendant EVELYN TINDIMUBONA, together with others, each aiding and abetting one another, did knowingly and willfully execute and willfully caused to be executed a scheme and artifice to defraud a health care benefit program affecting commerce, that is Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, by causing to be submitted a false and fraudulent claim from Comfort Choice Hospice Inc. to Medicare, namely claim number 22230800657107CAR for beneficiary T.B. for purported hospice services in the amount of approximately $7,021.00, in violation of 18 U.S.C. §§ 1347, 2.

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Joshua Preuss, HHS Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  03/30/2026

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Yervant P. Hagopian x0732

## Table of Contents

I.    INTRODUCTION..........................................2

II.   PURPOSE OF AFFIDAVIT..................................3

III.  SUMMARY OF PROBABLE CAUSE............................4

IV.   STATEMENT OF PROBABLE CAUSE..........................6

      A.    Background of Medicare Program..................6

            1.    Medicare Enrollment for Providers...........6

            2.    Medicare Claim Submission...................7

            3.    Medicare Payments to Providers..............8

            4.    Hospice Care Under Medicare.................8

      B.    TINDIMUBONA Controlled Comfort Choice and Other
            Hospices........................................9

      C.    TINDIMUBONA Used Comfort Choice to Execute a
            Health Care Fraud Scheme and Paid Kickbacks For
            Patient Referrals..............................11

            1.    Health Care Fraud Scheme...................11

            2.    Payment of Kickbacks to Marketers..........12

      D.    Comfort Choice Billed Medicare for Purported
            Hospice Services for Ineligible Beneficiaries...14

            1.    Comfort Choice's Live Discharge Rate Is 92%,
                  Almost Six Times Higher than the National
                  Average....................................15

            2.    Messages from TINDIMUBONA's PHONE..........15

            3.    Comfort Choice Beneficiary Interviews......19

V.    CONCLUSION...........................................33

## AFFIDAVIT

I, Joshua Preuss, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG-OI") and have been so employed since June 2016.  I am currently assigned to the Los Angeles Regional Office.  Prior to my employment with the HHS-OIG-OI, I was employed as a Special Agent with the United States Department of Defense, Department of the Air Force, Air Force Office of Special Investigations ("AFOSI") from June 2014 through May 2016.  As part of my initial training as a Special Agent, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia in April 2014.  I also graduated from AFOSI's Basic Special Investigators Course in June 2014 and HHS-OIG-OI's Special Agent Basic Training in November 2017.  I have received, and continue to receive on an ongoing basis, training specifically related to criminal healthcare fraud investigations and related crimes.

2.   I have led and participated in many aspects of criminal investigations, including: collecting and reviewing physical and electronic evidence; conducting surveillance; utilizing informants; interviewing witnesses, subjects, and targets of investigation; and preparing and serving subpoenas, search and arrest warrants, and other legal process. Currently,

my duties include investigating fraud, waste, and abuse within the Department of Health and Human Services, with the majority of time spent on Medicare fraud investigations.

3.   As an HHS-OIG-OI Special Agent, I am a federal law enforcement officer within the meaning of 5 U.S.C. § 406, in that I am empowered by law and authorized by the Attorney General to conduct investigations, seek and execute warrants, and make arrests for federal offenses.

4.   I am working jointly with HHS-OIG Special Agent Sara Ocegueda in the investigation of the subject of this affidavit.

5.   Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.  In addition, the events described in this affidavit occurred on or about the dates provided herein.  Where figures, calculations, dates, and times are reported herein, they are approximate.

## II. <u>PURPOSE OF AFFIDAVIT</u>

6.   This affidavit is made in support of a criminal complaint against and arrest warrant for Evelyn Tindimubona ("TINDIMUBONA") for a violation of 18 U.S.C. § 1347 (health care fraud) by submitting or causing the submission of Medicare claim, 22230800657107CAR, on November 4, 2022, for purported hospice services to T.B. in the amount of $7,021.00.

7.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of our investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  In addition, the events described in this affidavit occurred on or about the dates provided herein. Where figures, calculations, dates, and times are reported herein, they are approximate.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.     TINDIMUBONA is a licensed vocational nurse ("LVN") and the CEO and owner of multiple hospice companies, including Comfort Choice Hospice ("Comfort Choice").  From February 2, 2022, through October 6, 2025, TINDIMUBONA used Comfort Choice to submit more than $3.8 million in fraudulent hospice claims for purported hospice services to Medicare, for which Medicare paid more than $3.4 million.  Interviews of beneficiaries and other witnesses, TINDIMUBONA's electronic communications, and other evidence show that Comfort Choice billed Medicare for beneficiaries who were not eligible for hospice services and often did not know the services rendered to them were for hospice.  Electronic communications and bank records indicate TINDIMUBONA paid kickbacks to marketers for the referral of hospice patients.

9.    On October 24, 2024, agents executed search warrants of Comfort Choice (2:24-MJ-06354) and TINDIMUBONA's person (2:24-MJ-06355) signed by the Honorable Karen L. Stevenson on or about October 18, 2024.

10.   During the execution of the warrants, agents identified TINDIMUBONA in her vehicle outside Comfort Choice. Agents approached the vehicle and seized a cell phone from TINDIMUBONA's hand (hereinafter "TINDIMUBONA's PHONE"[1]).  Agents also seized medical records, digital evidence from computers, and business records that revealed the names of multiple other hospices and their association with TINDIMUBONA and TINDIMUBONA'S business partner, B.M.

11.   TINDIMUBONA's PHONE contained messages that show TINDIMUBONA knew patients were not dying, as indicated in a message sent by TINDIMUBONA on May 11, 2023 "I don't have dying patients."  In another message, TINDIMUBONA shows a history of unqualified hospice patients admitted to hospice.  The message seems to be regarding another hospice TINDIMUBONA owned and operated.  On June 15, 2020, TINDIMUBONA sent a WhatsApp message stating, "almost all of them are not really dying or hospice patients[.]"  Finally, TINDIMUBONA's PHONE contained messages indicative of paying kickbacks for patient referrals.  On December 4, 2021, TINDIMUBONA sent a WhatsApp message to a

---

[1] Unless otherwise indicated, all electronic messages referenced herein were extracted from TINDIMUBONA'S PHONE and are in the form of either WHATSAPP messages between TINDIMUBONA and the referenced individual's WHATSAPP accounts or text messages between TINDIMUBONA and the referenced individual's phone numbers.

suspected marketer stating, "And then when you bring patients you get paid too."

12. Ultimately, enrolling a patient into hospice when not medically appropriate can delay, or even prevent, life-prolonging care.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

13. Based on my review of Medicare documents, financial records, conversations with others involved in this investigation, my training and experience, and my own participation in this investigation, I am aware of the following information.

### A.    Background of Medicare Program

14. Medicare is a federal health insurance program for individuals 65 years of age and older, certain younger people with disabilities, and people with End-Stage Renal Disease. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).  The Centers for Medicare & Medicaid Services ("CMS") is the federal agency that runs the Medicare Program.  CMS is a branch of HHS.  Medicare is paid for through 2 trust fund accounts held by the U.S. Treasury.

15. Individuals enrolled into Medicare are Medicare beneficiaries ("beneficiaries") and are assigned a unique health insurance claim number and/or Medicare Beneficiary Identifier.

### 1.    <u>Medicare Enrollment for Providers</u>

16. All physicians, as well as eligible professionals (hereinafter "providers") as defined in Section 1848(k)(3)(B) of

the Social Security Act must complete a Medicare enrollment application[2] to enroll in the Medicare program.

17.  By signing and submitting the Medicare enrollment application, the provider agrees to adhere to all Medicare program requirements and applicable laws to include, but not limited to, the following: The provider will not misrepresent or falsify any information on the Medicare enrollment application; the provider will not submit false or fraudulent claims for payment by Medicare; and the provider will not submit claims based on underlying transactions that violate applicable laws and regulations, including the Anti-Kickback Statute.[3]

2.  Medicare Claim Submission

18.  Providers can submit Medicare claims electronically pursuant to an Electronic Data Interchange ("EDI") enrollment or with the appropriate hardcopy claim submission form.  Medicare claims must contain the following: beneficiary's name and date of birth; the date of the service; diagnosis code; and the provider.  A Provider agrees to be responsible for all claims it submits to Medicare for payment; that it will submit claims that are accurate, complete, and truthful; and it will retain all

---

[2] Medicare enrollment applications can be submitted electronically through the Provider Enrollment, Chain and Ownership System ("PECOS") or with the appropriate hardcopy CMS-855.

[3] The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a criminal law that prohibits the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients). Remuneration includes anything of value and can take many forms besides cash.

original source documentation and medical records for at least 6 years and 3 months after the claim is paid.

### 3. Medicare Payments to Providers

19. Medicare commonly pays provider claims electronically pursuant to an Electronic Funds Transfer Authorization Agreement ("EFT") also known as a CMS-588 form, which contains the provider's bank routing and account numbers.

### 4. Hospice Care Under Medicare

20. Hospice care[4] is a benefit under the hospital insurance program, Medicare Part A. To be eligible to elect hospice care under Medicare, a beneficiary must be entitled to Medicare Part A and be certified as being terminally ill. A beneficiary is deemed terminally ill if the medical prognosis is that the beneficiary's life expectancy is six months or fewer if the illness runs its normal course. The Medicare hospice benefit is only covered when a Medicare certified hospice renders the hospice service.

21. In order for Medicare to cover hospice services, the hospice must admit a beneficiary on the recommendation of the medical director in coordination with the beneficiary's attending physician (if any)[5] and the beneficiary must elect to receive

---

[4] Hospice care is for terminally ill individuals electing to forego life-prolonging medical services.

[5] Medicare rules and regulations define the attending physician as a doctor of medicine, doctor of osteopathy, or a nurse practitioner who has overall responsibility for the patient's medical care and treatment reported on institutional claims. Based on my training and experience, a beneficiary's attending physician would typically be their primary care physician.

hospice care (rather than, for example, treatment for the condition underlying their hospice admission).

22.   The hospice must obtain a written certification[6] of terminal illness ("CTI") for each benefit period.  A complete written certification must include: the beneficiary's medical prognosis is a life expectancy of six months or fewer if the terminal illness runs its normal course, and the signature(s) of the physician(s), the date signed, and the benefit period dates that the certification or recertification covers.  A hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice beneficiary prior to the beginning of the third benefit period, and prior to each subsequent benefit period.

23.   A beneficiary may revoke the election of hospice care at any time in writing.  A hospice cannot revoke a beneficiary's election.

24.   Discharge from hospice can occur if the beneficiary decides to revoke the hospice benefit; transfers to another hospice; dies; moves out of the hospice service area; or the beneficiary's condition improves such that the beneficiary is no longer considered terminally ill.

   **B.    TINDIMUBONA Controlled Comfort Choice and Other Hospices**

25.   I have reviewed records from the California Secretary of State's website and PECOS that show that since 2015,

---

[6] Only a doctor of medicine or doctor of osteopathy can certify or re-certify an individual as terminally ill.  Nurse practitioners and physician assistants cannot certify or re-certify an individual as terminally ill.

TINDIMUBONA, B.M., their relatives, and other associates have owned, controlled, and/or been associated with over 70 hospice and home health agencies.  TINDIMUBONA owned, controlled, or was directly affiliated with over half a dozen hospice and home health agencies, including Comfort Choice.  All these hospices have or had registered mailing addresses in Los Angeles County or Orange County, within the Central District of California.

26.  On November 28, 2017, the National Plan and Provider Enumeration System assigned NPI[7] number 1093229130 to Comfort Choice.  According to PECOS, TINDIMUBONA was first associated with Comfort Choice on or about October 13, 2017.

27.  On December 22, 2020, Comfort Choice submitted a Medicare enrollment application Form 855A listing TINDIMUBONA as Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and Secretary with a one hundred percent ownership interest in the company.

28.  On December 29, 2021, Comfort Choice submitted an Electronic Funds Transfer ("EFT") Authorization Agreement for Medicare payments to be electronically deposited into its business bank account at Wells Fargo Bank, checking account number ending in x8915 ("the Comfort Choice Bank Account"). TINDIMUBONA appears to have signed the EFT agreement as the authorized/delegated official and CEO of Comfort Choice during the initial enrollment. Comfort Choice received payments from

---

[7] NPI stands for National Provider Identifier, a unique identification number for health care providers to use during financial transactions.

Medicare via direct deposit to the Comfort Choice's Bank Account.  Records I reviewed show that TINDIMUBONA was the sole signatory on the Comfort Choice Bank Account.

29.  In December 2022, Comfort Choice submitted a Statement of Information to the State of California Secretary of State listing TINDIMUBONA as the CEO, Secretary, CFO, and registered agent.

30.  Medicare provider enrollment records listed TINDIMUBONA as Comfort Choice's owner.

**C.   TINDIMUBONA Used Comfort Choice to Execute a Health Care Fraud Scheme and Paid Kickbacks For Patient Referrals**

1.   Health Care Fraud Scheme

31.  Agents interviewed approximately 37 beneficiaries who were billed to Medicare for hospice services purportedly provided by entities controlled by or associated with TINDIMUBONA and B.M.  These entities include Comfort Choice, Emanuel Hospice, Doctors Palliative Care, Anaheim Hospice, Radiant Hospice, and Angel Rays Hospice.  At least 36 of said 37 beneficiaries[8] did not appear terminally ill to qualify for hospice.  In fact, some did not even know that they were billed to Medicare for hospice services.

---

[8] One beneficiary, E.A., was listed on claims billed by Anaheim Hospice and paid by Medicare for purported hospice services.  E.A., who was 67 years old at the time of the interview, indicated a doctor told them that they were terminally ill, but E.A. was uncertain for the reason.  E.A. was also unsure if they were told they had six months or fewer to live. In May 2024, E.A. was listed as still alive, which was approximately 18 months after the last date of service purportedly rendered by Anaheim Hospice to E.A.

32.  Among the interviewees, five (or their immediate family members) were enrolled in Comfort Choice and billed to Medicare for purported hospice services.  Based on the interviews, Comfort Choice submitted claims to Medicare for hospice services purportedly rendered to five beneficiaries who did not need, and in some cases, did not receive the services.  The information that the five beneficiaries provided was generally consistent with the information agents gathered from the other interviewees.

33.  In addition, agents interviewed seven primary care physicians (hereinafter "PCPs") or specialist for beneficiaries -- including a patient (S.B.) billed to Medicare through Comfort Choice -- billed to Medicare for purported hospice services provided by entities controlled by TINDIMUBONA and B.M.  None of the PCPs or specialists indicated that any of the beneficiaries were appropriate for hospice.  Further, none of the PCPs or specialists were familiar with the names of the hospice entities or the attending physician listed on the Medicare claims.

        2.    <u>Payment of Kickbacks to Marketers</u>

34.  As detailed below, Comfort Choice beneficiary T.B. indicated that a woman named "Courtney" (believed to be C.J.) signed T.B. up for hospice services at Comfort Choice.  It appears that Courtney was going to receive payment from Comfort Choice for enrolling beneficiaries, including T.B.

35.   Based on my training and experience, payments for referrals for hospice patients indicate that Courtney may have

been working as a marketer for Comfort Choice and was paid kickbacks for patient referrals.

a.    Based on my review of a financial analysis of the Comfort Choice Bank Account, between June and August 2022 three checks totaling $29,000 were made out to C.J.; one was for $7,000 and the other two were for $11,000 each.  Additionally, between September and October 2022 there were two checks totaling $30,750 paid to ERC Consulting Inc.; one was for $18,000 and the other was for $12,750.  According to the California Secretary of State website, a statement of information filed on September 2, 2022 listed E.J. as the agent for service of process; E.J. is believed to be C.J.'s husband.

36.  I know that marketers receiving illegal kickbacks for patient referrals are typically paid per patient in large, even-dollar amounts, which sometimes vary from company to company and marketer to marketer, and that payments to marketers are typically not regular payments of the same amount, as one might expect with a salary or fixed compensation.

37.  TINDIMUBONA's PHONE contained messages between TINDIMUBONA's WHATSAPP and WhatsApp account ending in 8888 (hereinafter "C.J.'s WHATSAPP")[9], which are summarized below:

a.    On May 11, 2022, C.J.'s WHATSAPP sent images of S.B.'s social security card, California driver license, Medicare card, and California benefits identification card, commonly used for benefits such as Medi-Cal, to TINDIMUBONA's WHATSAPP.

---

[9] The contact name stored for this WhatsApp account is 'Courtney Marketer'.

According to Medicare claims data, S.B. Comfort Choice admitted S.B. three days later.

b.   Likewise, on July 12, 2022, C.J.'s WHATSAPP sent images of T.B.'s California driver's license, Medicare card, and California benefits identification card to TINDIMUBONA's WHATSAPP.   Medicare claims data showed Comfort Choice admitted T.B. the same day.

39.   Altogether, there were more than a dozen other occasions in which C.J.'s WHATSAPP sent patients' Social Security numbers, driver's licenses, Medicare numbers, and/or Medicaid numbers to TINDIMUBONA.   Based on my training and experience, marketers or patient recruiters commonly receive approximately $1,000 per patient referral to a hospice for each month the patient is billed to hospice.   Checks written in even denominations may be indicative of a kickback payment for the patient referral.   I understand that payments to marketers can be made via check, cash, or other electronic payment methods. C.J.'s WHATSAPP provided the patient's driver licenses, social security cards, Medicare numbers, and/or Medicaid numbers to a hospice owner, TINDIMUBONA, is indicative of unlawful marketing. Of note, the contact name for C.J.'s WHATSAPP was "Courtiney Marketer."

**D.   Comfort Choice Billed Medicare for Purported Hospice Services for Ineligible Beneficiaries**

39.   Based on certified Medicare claims data dated March 11, 2026, Comfort Choice submitted approximately 623 claims to Medicare for approximately 88 beneficiaries and service rendered

between January 21, 2022, and September 12, 2025.  In total, Comfort Choice billed Medicare over $3.8 million in purported hospice claims and was paid over $3.4 million.

### 1. Comfort Choice's Live Discharge Rate Is 92%, Almost Six Times Higher than the National Average

40.    According to the National Hospice and Palliative Care Organization's 2023 edition of the NHPCO Facts and Figures ("NHPCO Publication"),[10] between 2019 and 2021, the average non-death discharge rate was 16.66% for all Medicare hospice discharges. The non-death discharge rate refers to the percentage of hospice patients that are discharged alive.  As noted above, in order to be eligible for Medicare reimbursement, hospice services must be provided to patients who have a life expectancy of six months or fewer if the terminal illness runs its normal course.  Based on my training and experience, a hospice discharging most patients alive is indicative of fraudulent billing for medically unnecessary services.  Here, Comfort Choice's live discharge rate was 92%, or about six times the foregoing average.

### 2. Messages from TINDIMUBONA's PHONE

41.  Messages extracted from TINDIMUBONA's PHONE show TINDIMUBONA knew about law enforcement operations against other hospice companies and was concerned about the increased scrutiny on hospice owners. Notwithstanding her knowledge and concern, based on Medicare data and electronic communications, TINDIMUBONA continued to admit ineligible patients to Comfort Choice for hospice care.

---

[10] The primary data source used for the findings in the NHPCO Publication is data from CMS.

42.   TINDIMUBONA knew Comfort Choice's patients were not appropriate for hospice.  The following message was sent during the period Comfort Choice was operating and billing Medicare: on May 11, 2023, TINDIMUBONA sent a text message to a suspected marketer using a phone number ending in 4303 stating, "I don't have dying patients."  Hospice is for patients who are diagnosed with a terminal illness and have a life expectancy of six months or fewer.

43.   In another message, TINDIMUBONA appears to show a historical pattern of admitting unqualified patients to hospice. The message seems to be regarding another hospice TINDIMUBONA owned or operated:  on June 15, 2020, TINDIMUBONA sent a WhatsApp message to WhatsApp account ending 8222 (hereinafter "R.B.'s WHATSAPP", a suspected marketer) stating, "almost all of them are not really dying or hospice patients[.]" A legitimate hospice should only bill Medicare for hospice patients and all patients must be projected to pass away within six months.

44.   Finally, TINDIMUBONA's PHONE contained messages indicative of paying kickbacks for patient referrals.  On December 4, 2021, TINDIMUBONA sent a WhatsApp message to R.B. stating, "And then when you bring patients you get paid too." Paying and receiving kickbacks to induce patient referrals is illegal and violates the Antikickback Statute.  Hospice owners, like TINDIMUBONA, are not only warned of this fact when enrolling as the owner of a Medicare provider, but they attest that they have read and understand such facts.

45.   The following text messages between TINDIMUBONA and C.F., who based on our investigation we understand to be a hospice consultant, contain a news article[11] and illustrate TINDIMUBONA's knowledge and concern:



**C.F.'s NUMBER (*0240)**

I am considering doing it my dear. It won't hurt us to appeal from these incompetent people. I will forward you another sting operation the government is doing for hospice agencies. This time they wanted owners and who ever runs the agency to prosecuted. 😫
3/31/2022 7:25:13 AM(UTC-7)

**C.F.'s NUMBER (*0240)**

https://www.latimes.com/california/story/2022-03-29/fraud-lax-oversight-california-end-of-life-hospice-industry-audit-finds
3/31/2022 7:25:44 AM(UTC-7)

**TINDIMUBONA's NUMBER (*9187)**

Omg 😵
3/31/2022 8:09:26 AM(UTC-7)

**TINDIMUBONA's NUMBER (*9187)**

This is not good
3/31/2022 8:09:49 AM(UTC-7)

**C.F.'s NUMBER (*0240)**

I know. It is really bad.
3/31/2022 8:13:06 AM(UTC-7)

**TINDIMUBONA's NUMBER (*9187)**

I am gettting scared
3/31/2022 8:13:20 AM(UTC-7)

46.   WhatsApp Messages between B.M. and TINDIMUBONA show the latter sought to "discharge all capped patients."[12]  Based on

---

[11]   On March 17, 2026, I reviewed the LA Times article associated to the link in the message.  The LA Times article generally discussed hospice fraud schemes, including owners/operators of hospices having unqualified patients and putting the patients at risk of not receiving appropriate care.

[12] The hospice cap is Medicare's way of making sure providers are not paid too much for patients who stay on hospice
*(footnote cont'd on next page)*

my training and experience, legitimate discharges from hospice are pursuant to a medical evaluation and not solely due to the hospice exceeding the cap.  Hospices often exceed the cap, because they admitted patients who do not qualify for hospice in that they are not dying and will live longer than six months. Accordingly, hospices may try to discharge the unqualified patients at or before six months after their admission to avoid exceeding the cap, meaning they bill Medicare for the purported hospice services for that duration since they know the patients are not projected to die prior to six months.

47.  B.M. acknowledged that B.M. and TINDIMUBONA paid marketers.

48.  On a separate date, TINDIMUBONA messaged B.M. via WhatsApp and said, "You can't just have dying only you will Never make money."

49.  The foregoing conversations are as follows:

| TINDIMUBONA's WHATSAPP (*9187) |
| --- |
| **We have to discharge all capped patients** |
| 8/30/2019 10:48:31 AM(UTC-7) |

| B.M.'s WHATSAPP (*3887) |
| --- |
| **Yes** |
| **Paying back is like medicare wins** |
| 8/30/2019 10:49:00 AM(UTC-7) |

---

longer than six months. Medicare sets a yearly dollar limit, and if a hospice's total payments go over that limit, the provider must pay back the extra money.

Example: If Medicare allows a hospice to receive up to $3 million for the year but the hospice is paid $3.2 million, they went $200,000 over the cap and must pay that $200,000 back to Medicare.

> **TINDIMUBONA's WHATSAPP (*9187)**
>
> I know
> 8/30/2019 10:49:34 AM(UTC-7)

> **B.M.'s WHATSAPP (*3887)**
>
> We pay marketer
> Dme
> Pharmacy etc
> 8/30/2019 10:49:44 AM(UTC-7)

> **TINDIMUBONA's WHATSAPP (*9187)**
>
> You need the ones that are not dying now so you can make real money
> 11/19/2022 3:46:27 PM(UTC-8)

a.    Further, messages between TINDIMUBONA and a contact saved as 'Pauline Marketer' (hereinafter "P.M.'s NUMBER") illustrate the same:

> **TINDIMUBONA's NUMBER (*9187)**
>
> You can't just have dying only you will Never make money
> 2/21/2024 6:47:48 PM(UTC-8)

> **P.M.'s NUMBER (*4922)**
>
> I know and is very tiring too.  Just doing all the admission and dc paperwork
> 2/21/2024 6:48:56 PM(UTC-8)

> **TINDIMUBONA's NUMBER (*9187)**
>
> Girl I know
> 2/21/2024 6:49:13 PM(UTC-8)

### 3.    Comfort Choice Beneficiary Interviews

50.    Law enforcement interviewed five beneficiaries that Comfort Choice billed to Medicare for purported hospice services and learned that none of them were terminally ill.  Based on my review of the Medicare data, Comfort Choice billed Medicare for these beneficiaries between June 21, 2022, and February 6, 2025

Page **19** of **33**

and received approximately $210,481.98 for those claims.  Below is a summary of three of the five interviews[13].

        *a.  Medicare Beneficiary T.B.*

51.  According to Medicare data, Comfort Choice purportedly rendered hospice services to T.B. from July 12 to November 9, 2022.  Comfort Choice's claims -- including Medicare claim, 22230800657107CAR, submitted on November 4, 2022, in the amount of $7,021.00 -- listed the diagnosis for T.B. as chronic obstructive pulmonary disease, unspecified.  Comfort Choice billed Medicare $27,266.80; Medicare paid $26,274.07.

52.  On November 30, 2022, Special Agent Ocegueda and I interviewed T.B. and learned that a woman named Courtney (believed to be Comfort Choice marketer, C.J.) approached T.B.'s daughter to offer T.B. Comfort Choice's hospice services.  Then, Courtney visited T.B. at T.B.'s home and enrolled T.B. with Comfort Choice.

53.  Subsequently, an unrelated nurse visited T.B. and informed T.B. that T.B. did not appear to be dying and did not require hospice services.  After learning from Courtney that Courtney was not getting paid as agreed for enrolling T.B. with Comfort Choice, T.B. contacted Comfort Choice to be removed.  T.B. was diagnosed with high blood pressure, high cholesterol, and degenerative disc disease.  However, T.B. has never been

---

[13] The interviews of K.F. and A.B. were generally consistent with those summarized herein.  Specifically, neither K.F. nor A.B. were terminally ill or had a life expectancy of six months or fewer.

diagnosed with a terminal illness or given less than six months or fewer to live.

54.   Text messages between TINDIMUBONA and a Comfort Choice employee, the Officer Manager for Comfort Choice (J.Y.), show TINDIMUBONA knew T.B. revoked hospice services from Comfort Choice and J.Y. proceeded to discharge T.B. from Comfort Choice. TINDIMUNBONA recognized that T.B. had not wanted the hospice services and J.Y. asked whether T.B. was going to be a problem. In response, TINDIMUBONA said T.B.'s daughter told her that T.B.'s daughter did not want T.B.'s hospice benefits used and did not believe T.B. qualified for hospice. Additionally, J.Y. believed A.T. was T.B.'s daughter and a Comfort Choice patient who was discharged due to a car accident. TINDIMUBONA dismissed T.B.'s daughter's concerns.  The foregoing conversation is as follows:

TINDIMUBONA's NUMBER (*9187)

**[T.B.] revoked**
11/9/2022 12:36:31 PM(UTC-8)

J.Y.'s NUMBER (*5766)

**Yes [J.LNU.] told me**
11/9/2022 12:36:41 PM(UTC-8)

J.Y.'s NUMBER (*5766)

**Will dc now**
11/9/2022 12:36:44 PM(UTC-8)

TINDIMUBONA's NUMBER (*9187)

**She is Been not teallly wanting the service**
11/9/2022 12:37:04 PM(UTC-8)

J.Y.'s NUMBER (*5766)

**Ohh ok but she will not be a prob?**
11/9/2022 12:37:25 PM(UTC-8)

TINDIMUBONA's NUMBER (*9187)

**Not really I spoke to the Daugher and daughter**

> **said she doesn't want to use he benefits because she believes she doesn't qualify blah blah**
> 11/9/2022 12:38:11 PM(UTC-8)

J.Y.'s NUMBER (*5766)

> **[A.T.]?**
> 11/9/2022 12:38:24 PM(UTC-8)

J.Y.'s NUMBER (*5766)

> **Is this courtneys patient?**
> 11/9/2022 12:38:46 PM(UTC-8)

TINDIMUBONA's NUMBER (*9187)

> **No [T.B.] daughter**
> 11/9/2022 12:38:51 PM(UTC-8)

TINDIMUBONA's NUMBER (*9187)

> **Yea**
> 11/9/2022 12:38:55 PM(UTC-8)

J.Y.'s NUMBER (*5766)

> **Yes remember her daughter was [A.T.]**
> 11/9/2022 12:39:07 PM(UTC-8)

J.Y.'s NUMBER (*5766)

> **She used to be our patient too**
> 11/9/2022 12:39:11 PM(UTC-8)

J.Y.'s NUMBER (*5766)

> **But then she got into a car accident thats why we discharged her**
> 11/9/2022 12:39:25 PM(UTC-8)

55. Based on my review of Medicaid data, Comfort Choice admitted A.T. on July 12, 2022, for a terminal diagnosis of chronic obstructive pulmonary disease, unspecified and it discharged A.T. on August 1, 2022. Comfort Choice billed Medicaid $6,438.48; Medicaid paid in full.

56. If T.B. and A.T. are indeed mother and daughter, it is unusual for two relatives to be admitted to the same hospice on the same day with identical diagnoses.

57. In the same exchange between J.Y. and TINDIMUBONA, the former mentioned that T.B. was C.J.'s patient; however, according to the California Department of Consumer Affairs

website, C.J. does not hold any medical license. In my training and experience, hospice employees commonly describe individuals recruited by marketers as the "marketer's patients," even if the marketer does not medically treat that individual.  This is consistent with J.Y.'s reference to T.B. as C.J.'s patient and indicates C.J. was a marketer for Comfort Choice.

58.  WhatsApp Messages between TINDIMUBONA and C.J. corroborate that A.T. asked TINDIMUBONA for Comfort Choice to discharge T.B.  T.B.'s daughter told TINDIMUBONA that "Courtney" (believed to be C.J.) told T.B. and/or T.B.'s daughter that T.B. qualified for hospice, but others informed T.B. and/or T.B.'s daughter that that was untrue.  TINDIMUBONA tried to convince T.B. to stay on hospice for the duration of her benefit period. The foregoing conversation is as follows:

| | TINDIMUBONA's WHATSAPP (*9187) |
|---|---|
| | **The daughter of [T.B.] called saying that she wnata the mom discharged**<br>11/9/2022 11:04:03 AM(UTC-8) |
| | TINDIMUBONA's WHATSAPP (*9187) |
| | **She said Courtney said she was qualified but a group of people told her she is not smh** 💀<br>11/9/2022 11:04:35 AM(UTC-8) |
| | TINDIMUBONA's WHATSAPP (*9187) |
| | **I tried to explain that she shoud finsih her period and she insisted**<br>11/9/2022 11:05:01 AM(UTC-8) |
| C.J.'s WHATSAPP (*8888) | |
| **Omgosh**<br>11/9/2022 11:05:13 AM(UTC-8) | |
| | TINDIMUBONA's WHATSAPP (*9187) |
| | **May be that hoapice is talking to these patients**<br>11/9/2022 11:05:16 AM(UTC-8) |
| C.J.'s WHATSAPP (*8888) | |

> **Those haters**
> 11/9/2022 11:05:21 AM(UTC-8)

> TINDIMUBONA's WHATSAPP (*9187)
>
> **The way I was talking to her it seems some one is in her ear**
> 11/9/2022 11:05:36 AM(UTC-8)
>
> TINDIMUBONA's WHATSAPP (*9187)
>
> **I begged her to finish her second period she said no a group of people told her**
> 11/9/2022 11:06:12 AM(UTC-8)

59. Based on my training and experience, these messages further show TINDIMUBONA knew T.B. was unqualified for hospice yet wanted T.B. to remain on hospice. Additionally, TINDIMUBONA's message acknowledged that C.J. told T.B. that T.B. qualified for hospice. Again, C.J. does not possess a medical license. As a hospice owner and LVN, TINDIMUBONA should know that only a Doctor of Medicine or Osteopathy can determine if a patient is qualified for hospice care.

*b.    Medicare Beneficiary J.S.*

60. According to Medicare data, Comfort Choice purportedly rendered hospice services to J.S. from June 20 to November 19, 2022. Comfort Choice's claims listed J.S.' diagnosis as hypertensive heart disease with heart failure. Comfort Choice billed Medicare $34,984.51; Medicare paid $32,447.40.

61. On March 15, 2023, Special Agent Ocegueda and I interviewed J.S. and learned that J.S. does not have heart disease, was not familiar with Comfort Choice, has never been diagnosed with a terminal illness, and has not been given less than six months to live.

62.   WhatsApp messages between TINDIMUBONA and a Comfort Choice marketer, R.B., show J.S. wanted to wait until after Father's Day weekend to be admitted to Comfort Choice. Subsequent messages show J.S. wanted to be prescribed Norco 10mg.  Instead, TINDIMUBONA offered other drugs such as Xanax and 5/325 (which could be either hydrocodone/acetaminophen or oxycodone/acetaminophen):

R.B.'s WHATSAPP (*8222)

**Boo [J.S.] wants to sign Monday it's Father's Day this weekend he is with his daughter but his caregiver said he has one for me on Monday we gonna keep trying that all**
6/17/2022 12:21:56 PM(UTC-7)

TINDIMUBONA's WHATSAPP (*9187)

**Ok boo**
6/17/2022 12:52:04 PM(UTC-7)

R.B.'s WHATSAPP (*8222)

**Boo will mr [J.S.] be able to get Norco 10mg qid He said he is not benefiting if the pain is still present, I don't know hay to tell him I told him before I am nit the Md and the pharmacist over rides the md**
6/22/2022 10:57:40 AM(UTC-7)

R.B.'s WHATSAPP (*8222)

**His caregiver is a butt**
6/22/2022 10:57:46 AM(UTC-7)

TINDIMUBONA's WHATSAPP (*9187)

**Let's kn**
6/22/2022 10:59:32 AM(UTC-7)

TINDIMUBONA's WHATSAPP (*9187)

**Boo I don't wanna loose the patient be easy on him tell him
We can give 0.5 Xanax amd
5/325**
6/22/2022 11:16:37 AM(UTC-7)

TINDIMUBONA's WHATSAPP (*9187)

**After 2 weeks we can change**

Page **25** of **33**

TINDIMUBONA's WHATSAPP (*9187)
6/22/2022 11:16:44 AM(UTC-7)

That's the stages they follow when the system doesn't show that he has ever taken norcotics
6/22/2022 11:17:23 AM(UTC-7)

R.B.'s WHATSAPP (*8222)

Lol boo he needs to be easy on me he think I do magic or can make things happen I can't
6/22/2022 11:18:54 AM(UTC-7)

TINDIMUBONA's WHATSAPP (*9187)

Smh 💀
6/22/2022 11:19:41 AM(UTC-7)

TINDIMUBONA's WHATSAPP (*9187)

There patients will make me go crazy
6/22/2022 11:19:50 AM(UTC-7)

R.B.'s WHATSAPP (*8222)

Boo and do menrion I told him all this befor he told he he took Percocet he was dishonest with me. Having me look stupid I know the spill
We been through this to many times for me not to be honest
6/22/2022 11:19:52 AM(UTC-7)

TINDIMUBONA's WHATSAPP (*9187)

The system has everything
6/22/2022 11:20:18 AM(UTC-7)

63.    Based on my training and experience, J.S.'s election to postpone signing hospice documents is inconsistent with the level of urgency typically associated with legitimate hospice patients. J.S.' behavior also contradicts claims of severe pain, as a patient needing stronger narcotics would not normally postpone hospice admission.  TINDIMUBONA also expressed concern about losing the patient and appeared willing to offer other medication to keep J.S enrolled.  This conduct is inconsistent with standard hospice pain management.

64.   Text messages between TINDIMUBONA and Comfort Choice employee J.Y. show J.Y. asked TINDIMUBONA which referring doctor should be used for J.S; J.Y. suggested a particular doctor. TINDIMUBONA was not sure whether they paid that doctor but nevertheless chose that doctor; TINDIMUBONA told J.Y. that they would have to backdate J.S.' admission.  The foregoing conversation is as follows:

J.Y.'s NUMBER (*5766)

**Which referring dr will i use for [J.S.]**
6/21/2022 12:43:58 PM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**Hmmm**
6/21/2022 12:44:36 PM(UTC-7)

J.Y.'s NUMBER (*5766)

**U want [Dr. A.]**
6/21/2022 12:53:36 PM(UTC-7)

J.Y.'s NUMBER (*5766)

**?**
6/21/2022 12:53:37 PM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**Not sure if we sent his check**
6/21/2022 1:18:17 PM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**But yea he will**
**Go Sunday but we have to backdate**
6/21/2022 1:18:35 PM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**Let me talk to him**
**First**
6/21/2022 1:18:52 PM(UTC-7)

65.   Based on my training and experience, a legitimate referral for any medical service would identify the physician making the referral and precede the service.  Conversely, TINDIMUBONA suggests using Dr. A. and that the referral must be

backdated.  TINDIMUBONA also comments that she is unsure whether Dr. A.'s check has been sent, which suggests that her decision is influenced by compensation rather than a legitimate medical determination. This exchange shows J.Y. and TINDIMUBONA were creating and backdating patient referrals after the patient's admission to Comfort Choice rather than admitting pursuant to legitimate referrals from actual treating providers.

66.  Additional text messages show J.Y. told TINDIMOBUNA that J.S. wished to be discharged from hospice according to "Rebecca" (believed to be R.B.).  The messages indicate that Rebecca originally brought J.S. to Comfort Choice but TINDIMOBUNA expressed concern that Rebecca eventually began taking patients away.  J.Y. explained that two weeks prior, Rebecca said J.S. requested different pain medication. TINDIMOBUNA suggested a different doctor should sign J.S.' prescriptions instead. Seconds after TINDIMOBUNA learned J.S. did not want Percocet, she told J.Y. to remove J.S.  J.Y. confirmed she would discharge J.S. that day.

67.  Additionally, as a hospice provider, the hospice should not rapidly discharge a patient simply because the patient requests a different medication.  Hospice care is designed to provide comfort and symptom management at the end of life.  The rapid decision to discharge J.S. without medical assessment, review of symptoms, or evaluation of continued hospice eligibility raises questions about whether J.S.' clinical status was appropriately considered before discharge.

c.   *Medicare Beneficiary S.B.*

68.   According to Medicare data, Comfort Choice purportedly rendered hospice services to S.B. between May 14 to 30, 2022 and July 1 to October 21, 2022.  Comfort Choice's claims listed S.B.'s diagnosis as end-stage heart failure.  Comfort Choice billed Medicare $30,002.80; Medicare paid $27,930.69.

69.   On June 1, 2023, Special Agent Ocegueda and I interviewed S.B. and learned that S.B. was never diagnosed with a terminal illness or given less than six months to live.  Although S.B. had a previous heart attack and issues with heart failure, S.B. was never diagnosed with end-stage heart failure; rather, S.B.'s condition was being treated with medication.

70.   Three months later, on September 14, 2023, Special Agent Ocegueda and I interviewed S.B.'s PCP, Dr. J.C., who saw S.B. on June 27, 2022, and observed no indication of end stage heart failure or any other terminally illness.  In other words, Dr. J.C. did not believe S.B. was appropriate for hospice.  Moreover, Dr. J.C. had never heard of Comfort Choice or Dr. R.G., the attending physician listed on Comfort Choice's claims to Medicare regarding S.B.

71.   Text messages between TINDIMUBONA and J.Y. show that J.Y. reported that S.B's wife questioned, "you want my husband to die?" J.Y. also reported she told S.B.'s wife, "I was like no [of course] not [.]" TINDIMOBUNA instructed J.Y. not to readmit S.B. stating that doing so would be a "red flag."  About six days later, TINDIMUBONA asked J.Y. if they should readmit S.B.

J.Y. says they can and TINDIMUBONA decides to send an LVN. The foregoing conversation is as follows:

J.Y.'s NUMBER (*5766)

**She keeps saying you want my husband to die?**
6/17/2022 10:18:43 AM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**It's red flag**
6/17/2022 10:18:44 AM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**Oh dear**
6/17/2022 10:18:51 AM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**Don't readmit**
6/17/2022 10:18:58 AM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**Will talk to her**
6/17/2022 10:19:07 AM(UTC-7)

J.Y.'s NUMBER (*5766)

**I was like no ofcourse not but you should have called us first so we can manage his symptoms as we have a team in Lancaster that could be with you guys in 10-15 minutes**
6/17/2022 10:19:33 AM(UTC-7)

J.Y.'s NUMBER (*5766)

**[L.LNU.] the daughter is upset and said theyve been waiting for someone to readmit so i said weve been calling and theyre not answering lol**
6/30/2022 1:15:10 PM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**Oh boy**
6/30/2022 1:18:06 PM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**Let's take him**
6/30/2022 1:18:13 PM(UTC-7)

J.Y.'s NUMBER (*5766)

Page **30** of **33**

**When can u go to admit**
6/30/2022 1:20:04 PM(UTC-7)

TINDIMUBONA's NUMBER (*9187)

**This week is horrible not sure but might go early sat**
6/30/2022 1:22:24 PM(UTC-7)

72.   Based on my training and experience, the messages suggest S.B and/or his wife did not understand that S.B. had been admitted to hospice or that hospice is meant for patients who are terminally ill. Again, hospice is intended for individuals with a terminal illness and a life expectancy of six months or fewer; therefore S.B.'s wife should not have been surprised if her husband were truly in such a condition.

73.   The messages also show S.B.'s family members were attempting to get S.B. readmitted on June 17, 2022, but TINDIMUBONA did not want to have S.B. readmitted due to him being a red flag since other messages show S.B. was discharged due to being admitted to a hospital.  S.B.'s hospital admission demonstrates a patient seeking curative treatment, a contradiction to hospice.

//

//

## V.   <u>CONCLUSION</u>

74.   For all the reasons described above, there is probable cause to believe that TINDIMUBONA has committed a violation of 18 U.S.C. § 1347 (health care fraud) by submitting or causing the submission of a fraudulent Medicare claim, 22230800657107CAR, on November 4, 2022 for purported hospice services to T.B. in the amount of $7,021.00.

JOSHUA PREUSS, Special Agent
Department of Health and Human
Services – Office of Inspector
General

Attested to by the applicant in
Accordance with the requirements
Of Fed. R. Crim. P. 4.1 by
Telephone on this 30th day of
March, 2026

*Patricia Donahue*

HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE